**Albert DURO, Petitioner-Appellee,**

v.

**Edward REINA, Chief of Police, Salt River Department of Public Safety, Salt River Pima-Maricopa Indian Community, et al., Respondents-Appellants.**

**No. 85–1718.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 8, 1985.

Decided July 9, 1987.

---

Before CHOY, SNEED and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

The question before us is whether an Indian may be subject to the criminal jurisdiction of the court of a tribe of which neither he nor his victim was a member. The district court ordered officials of an Indian tribe to discharge appellee from custody and to abstain from further criminal prosecution. We conclude that the tribe properly asserted criminal jurisdiction over appellee because he is an Indian, albeit an Indian enrolled in a different tribe. We therefore vacate and remand.

## I.

### FACTS AND PROCEEDINGS BELOW

Appellee Albert Duro, petitioner below, is an enrolled member of the Torrez-Martinez band of Mission Indians. Duro was born in Riverside, California. He has lived all but one year of his life outside of his tribal reservation. From approximately March 1984 to approximately June 15, 1984, Duro resided within the Salt River Indian Reservation (Reservation). During this time, Duro lived with his girlfriend in her family home. His girlfriend is a member of the Salt River Pima-Maricopa Indian Community (Community or tribe). Duro worked for the PiCopa Construction Company. The Community owns the company. However, the company does not require its employees either to reside within the Reservation or to be members of the Community.

The Community is a federally recognized tribal entity that exercises authority over the Reservation. Duro is not eligible for membership in the Community. Appellant Edward Reina, respondent below, is Chief of Police of the Community's Department of Public Safety. Appellant the Honorable Relman R. Manuel, Sr., respondent below, is Chief Judge of the Indian Community Court (tribal court).

On June 18, 1984, criminal complaints against Duro were filed in both the tribal court and the United States District Court

Richard B. Wilks, Phoenix, Ariz., for respondents-appellants.

John Trebon, Phoenix, Ariz., for petitioner-appellee.

Rodney B. Lewis, Sacaton, Ariz., Edward G. Maloney, Jr., Seattle, Wash., for amici curiae.

for the District of Arizona. The tribal court complaint charged Duro with discharge of a firearm within the boundaries of the Reservation, which violates the Community's Code of Misdemeanors. The district court complaint charged Duro with murder and aiding and abetting murder, which violates 18 U.S.C. §§ 2, 1111, and 1153. The complaints pertained to the same event. On or about June 15, 1984, Duro allegedly shot Phillip Fernando Brown, a fourteen year old boy, and killed him. Brown was an enrolled member of the Gila River Indian Tribe, which resides on a separate reservation.

Federal agents arrested Duro near his home in California on June 19 and removed him to the District of Arizona. On July 25, a grand jury indicted Duro for first degree murder. The district court dismissed the indictment without prejudice on the motion of the United States. Duro was then placed in the custody of the Salt River Department of Public Safety. On October 19, the tribal court denied Duro's motion to dismiss for lack of criminal jurisdiction. Duro petitioned the district court for a writ of habeas corpus and/or a writ of prohibition. The court granted the requested relief on January 14, 1985. Appellants timely appealed from that judgment.

## II.

### STANDARD OF REVIEW

█ Our review of a district court's decision on a petition for a writ of habeas corpus is de novo. *Chatman v. Marquez*, 754 F.2d 1531, 1533–34 (9th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 124, 88 L.Ed.2d 101 (1985). We review for an abuse of discretion the district court's decision to issue a writ of prohibition. The district court had jurisdiction over this case under the habeas corpus statute, 28 U.S.C. § 2241(c)(1) & (3). Therefore the court could issue auxiliary writs in aid of its jurisdiction "in its sound judgment," within the limits set by Congress. *United States v. New York Tel. Co.*, 434 U.S. 159, 172–73, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 273, 63 S.Ct. 236,

239, 87 L.Ed. 268 (1942)); *see Mead v. Parker*, 464 F.2d 1108, 1112 (9th Cir.1972).

## III.

### DISCUSSION

This case brings before us an issue of first impression: whether the criminal jurisdiction of a tribal court extends to an Indian who is not a member of the tribe, if he is accused of committing an offense against another nonmember Indian on the tribe's reservation. This issue concerns one of the uncharted reaches of tribal jurisdiction and presents a troubling choice between recognizing new restrictions on tribal sovereignty on the one hand, and placing an additional jurisdictional liability upon Indians not members of the tribe whose jurisdiction is in question.

In resolving questions of tribal sovereignty, we ordinarily are guided by those tribal powers historically exercised, the will of Congress as expressed in treaty and statute, and a considerable body of decisional law. Such sources, however, are of little aid in resolving the present controversy. The exercise of tribal criminal jurisdiction over nonmember Indians is virtually without historical precedent. This is not because such power did not theoretically reside in the tribes, but rather because circumstances, for other reasons, did not give rise to its exercise. The circumstances giving rise to the instant case have their roots in the present displacement of many Indian tribes, the resultant heterogeneity of present day reservation populations, and the increasing prevalence and sophistication of tribal courts. Our reliance in turn on statute and case law is restrained by the indiscriminate use by Congress and the courts of the terms "Indian" and "non-Indian"—"Indian" frequently has been used to denote "tribal member," while "non-Indian" has served as a synonym for "nonmember." Having acknowledged the complexity and moment of the question before us, we turn to its resolution.

### A. *Oliphant v. Suquamish Indian Tribe*

At the outset we face the question of whether *Oliphant v. Suquamish Indian*

*Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), controls this case. In that case, two non-Indians were charged with committing crimes on a reservation. The Supreme Court ruled that the tribal court did not have criminal jurisdiction over them. The Court's opinion explicitly refers only to non-Indians. However, some subsequent opinions describe *Oliphant* as excluding nonmember Indians as well from the criminal jurisdiction of the tribal courts. *See Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 173, 102 S.Ct. 894, 920, 71 L.Ed.2d 21 (1982); *United States v. Wheeler,* 435 U.S. 313, 326, 98 S.Ct. 1079, 1087, 55 L.Ed.2d 303 (1978). Other opinions describe *Oliphant*'s holding as limited to non-Indians. *See National Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 853–55, 105 S.Ct. 2447, 2452–53, 85 L.Ed.2d 818 (1985); *Washington v. Confederated Tribes,* 447 U.S. 134, 153, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980). It appears that the Court has not used the terms non-Indian and nonmember Indian precisely.[1] The holdings of the cases cited do not depend on making that distinction with regard to *Oliphant.* We give little weight to these casual references. Certainly we will not extend the literal holding in *Oliphant* on the basis of them alone.

We turn next to the reasoning in *Oliphant* to determine whether the holding extends to nonmember Indians as well as to non-Indians. The tribal court traced its authority to try non-Indians to the tribe's retained inherent powers of government over the reservation. 435 U.S. at 196, 98 S.Ct. at 1014. The Court rejected this argument. First, it identified a historical shared presumption on the part of Congress, the executive branch, and the lower federal courts that tribal courts do not have the power to try non-Indians. Second, it examined the particular treaty signed by the Suquamish for indications that the tribe had ceded criminal jurisdiction to the federal government. Finally, it determined in the light of precedent that the exercise of criminal jurisdiction would be inconsistent with the tribe's dependent status.

Applying the *Oliphant* analysis to Duro's case, we note first that the historical evidence is equivocal on the question of whether tribal court jurisdiction extends to nonmember Indians. On the one hand, there are indications that the executive branch and courts assumed that tribal courts may try crimes committed by any Indian, whether or not he is a tribe member. Collins, *Implied Limitations on the Jurisdiction of Indian Tribes,* 54 Wash.L. Rev. 479, 479 n. 5 (1979) (citing 25 C.F.R. § 11.2(c) (1978); *United States v. Burland,* 441 F.2d 1199, 1200 n. 1 (9th Cir.), *cert. denied,* 404 U.S. 842, 92 S.Ct. 137, 30 L.Ed.2d 77 (1971); *Arizona ex rel. Merrill v. Turtle,* 413 F.2d 683, 686 (9th Cir.1969), *cert. denied,* 396 U.S. 1003, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970)). On the other hand, both executive and congressional pronouncements apparently use the word "Indian" to mean "tribal member," implying that non-Indians and nonmembers have the same status. *See* Comment, *Jurisdiction*

---

1. A similar inconsistency pervades the opinions of this court. *Compare, e.g., Hardin v. White Mountain Apache Tribe,* 779 F.2d 476, 478 (9th Cir.1985) (tribes lack inherent power to punish non-Indians for criminal acts, but presumably have that power with regard to nonmember Indians) *with, e.g., United States v. Johnson,* 637 F.2d 1224, 1230 (9th Cir.1980) (inherent tribal sovereignty includes power to punish "tribal offenders," but presumably not nonmember Indians, for violation of criminal laws). Indeed, individual opinions are internally inconsistent on this point. *See Babbitt Ford, Inc. v. Navajo Indian Tribe,* 710 F.2d 587, 596 n. 9, 598 (9th Cir.1983), *cert. denied,* 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984); *Cardin v. De La Cruz,* 671 F.2d 363, 364, 366 (9th Cir.) (*Oliphant*

eliminates criminal jurisdiction only over non-Indians; yet, if extended to civil cases, it would "eliminate altogether any tribal jurisdiction over persons not members of the tribe"), *cert. denied,* 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). Authors of earlier opinions might have used "nonmember Indian" and "non-Indian" as synonyms. At a minimum, they did not distinguish carefully between the two categories. Therefore these opinions are not helpful in resolving this case, in which the distinction between nonmember Indian and non-Indian is crucial. *See Williams v. Clark,* 742 F.2d 549, 555 n. 7 (9th Cir.1984) (whether a tribe may exercise criminal jurisdiction over nonmembers is an open question), *cert. denied,* 471 U.S. 1015, 105 S.Ct. 2017, 85 L.Ed.2d 299 (1985).

*over Nonmember Indians on Reservations,* 1980 Ariz.St.L.J. 727, 746–48.

Perplexed by these ambiguities in the historical record, we turn to the Court's third argument in *Oliphant.* "By submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily give up their power to try non-Indian citizens of the United States except in a manner acceptable to Congress." 435 U.S. at 210, 98 S.Ct. at 1021. This overriding sovereignty argument was the core of the Court's opinion.[2] *Id.* at 206, 208, 98 S.Ct. 1019, 1020 (explaining the lesser importance of the other arguments). At first blush, the theory of overriding sovereignty appears to limit the jurisdiction of tribal courts only with respect to non-Indians, to whom the tribes originally submitted. Tribal courts would retain jurisdiction over non-member Indians. However, all Indians are now United States citizens. 8 U.S.C. § 1401(a)(2). As citizens, Indians as well as non-Indians can claim to be exempt from the criminal jurisdiction of tribes, which are sovereign entities subordinate to the United States. This suggests an equal protection claim to which we next turn. It is evident, however, that the reasoning of *Oliphant,* like its language, does not dispose of this case.

### B. Equal Protection

The district court ruled that the tribe's exercise of criminal jurisdiction over Duro denied him the equal protection of its laws in violation of the Indian Civil Rights Act, 25 U.S.C. § 1302.[3] The court said that the distinction between nonmember Indians and non-Indians "is based solely upon race." It recognized that racial classifications ordinarily must withstand strict scrutiny. Finally, it concluded that "[t]he discriminatory enforcement of tribal criminal jurisdiction in this case cannot be upheld under either the rational basis or strict scrutiny standards." We consider in turn each step of the district court's reasoning.

### 1. Racial classification

The Supreme Court has made clear that "federal legislation with respect to Indian tribes, although relating to Indians as such, is not based upon impermissible racial classifications."[4] *United States v. Antelope,* 430 U.S. 641, 645, 97 S.Ct. 1395, 1398, 51 L.Ed.2d 701 (1977). The district court accepted this proposition with respect to legislation concerning federally recognized Indian tribes, which are political rather than racial groups. *See Morton v. Mancari,*

---

**2.** Commentators have sharply criticized the Court's use of historical authority in *Oliphant* to support its first two arguments. Collins, *supra,* at 490–99; Note, *Indians—Jurisdiction—Tribal Courts Lack Jurisdiction over Non-Indian Offenders,* 1979 Wis.L.Rev. 537, 540–51. The third argument is not vulnerable to these attacks, which further enhances its importance.

**3.** The Indian Civil Rights Act is the sole source of Duro's equal protection claim. Neither the Bill of Rights nor the Fourteenth Amendment limits the authority of Indian tribes. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978). The equal protection provision of the Act extends to any person, even a non-Indian, within the jurisdiction of the tribe. Schultz, *The Federal Due Process and Equal Protection Rights of Non-Indian Civil Litigants in Tribal Courts After Santa Clara Pueblo v. Martinez,* 62 Denv. L.Rev. 761, 773–75 (1985). Therefore Duro may invoke it despite his status as a nonmember.

**4.** This case does not concern federal legislation, but rather the tribe's exercise of its retained sovereign powers. Therefore the equal protec-

tion standard of the Indian Civil Rights Act applies, not the implicit equal protection requirement of the Fifth Amendment. *See supra* note 3. We are satisfied that the equal protection standard of the Indian Civil Rights Act is no more rigorous than its Fifth Amendment counterpart. The Indian Civil Rights Act "selectively incorporated and in some instances modified the safeguards of the Bill of Rights to fit the unique political, cultural, and economic needs of tribal governments." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 62–63, 98 S.Ct. 1670, 1679, 56 L.Ed.2d 106 (1978). Congress intended to foster tribal self-determination as well as to protect individual rights. *Id.* at 62, 98 S.Ct. at 1679. If Congress altered the constitutional equal protection standard at all, it diluted it. *Howlett v. Salish & Kootenai Tribes,* 529 F.2d 233, 238 (9th Cir.1976). Our argument that the tribal court's assertion of criminal jurisdiction is valid under the implicit equal protection guarantee of the Fifth Amendment necessarily implies that it is valid under the equal protection guarantee of the Indian Civil Rights Act.

417 U.S. 535, 553 n. 24, 94 S.Ct. 2474, 2484, n. 24, 41 L.Ed.2d 1290 (1974). Therefore the district court recognized that tribal courts may exercise criminal jurisdiction over member Indians even though non-Indians are exempt. However, it viewed the extension of tribal court criminal jurisdiction to nonmember Indians as based on race alone.

The district court erroneously assumed that tribal courts extend their criminal jurisdiction to Indians on the basis of race. Who is an Indian turns on numerous facts of which race is only one, albeit an important one. The criminal jurisdiction of federal courts also turns, in part, on who is an Indian. *See, e.g.,* 18 U.S.C. §§ 1152, 1153. Federal courts identify Indians by reference to an individual's degree of Indian blood and his tribal or governmental recognition as an Indian. *United States v. Broncheau,* 597 F.2d 1260, 1263 (9th Cir.), *cert. denied,* 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80 (1979). Members of terminated tribes do not qualify as Indians, regardless of their race. *United States v. Heath,* 509 F.2d 16, 19 (9th Cir.1974). Enrolled members of tribes qualify as Indians if there is some other evidence of affiliation, such as residence on a reservation and association with other enrolled members. *United States v. Indian Boy X,* 565 F.2d 585, 594 (9th Cir.1977), *cert. denied,* 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978). A person of mixed blood who is enrolled in a recognized tribe or otherwise affiliated with it may be treated as an Indian. *Ex parte Pero,* 99 F.2d 28, 31 (7th Cir.1938), *cert. denied,* 306 U.S. 643, 59 S.Ct. 581, 83 L.Ed. 1043 (1939); R. Flowers, *Criminal Jurisdiction Allocation in Indian Country* 6 (1983). For the purpose of federal jurisdiction, Indian status is "based on a totality of circumstances, including genealogy, group identification, and lifestyle, in which no one factor is dispositive." Clinton, *Criminal Jurisdiction over Indian Lands: A Journey Through a Jurisdictional Maze,* 18 Ariz.L.Rev. 503, 518 (1976). Tribal courts may define their criminal jurisdiction according to a similarly complex notion of who is an Indian.

In this case, Duro is enrolled in a recognized tribe, although not in the Community. He was closely associated with the Community through his girlfriend, a Community member, his residence with her family on the Reservation, and his employment with the PiCopa Construction Company. These contacts justify the tribal court's conclusion that Duro is an Indian subject to its criminal jurisdiction. We stress that this is not purely a racial determination. Indeed, the record does not describe Duro's ancestry, so we do not know his degree of Indian blood.

### 2. *Rational basis*

The Community wishes to extend the tribal court's criminal jurisdiction to nonmember Indians in order better to enforce the law on the Reservation. Federal prosecution of crimes on reservations has long been inadequate. *Jurisdiction on Indian Reservations, Hearing on S.3092 Before the Senate Select Comm. on Indian Affairs,* 98th Cong., 2d Sess. 21, 27–28 (1985) (statements of Caleb Shields, Councilman, Assiniboine & Sioux Tribes, Fort Peck Reservation, Montana, and James C. Nelson, County Attorney, Glacier County, Montana); American Indian Policy Review Comm'n, *Report on Federal, State, and Tribal Jurisdiction* 37–39 (1976). Law enforcement by state officials is also undependable, American Indian Policy Review Comm'n, *supra,* at 39–40, in part because of jurisdictional uncertainties that will be discussed in the next subsection. Furthermore, treating nonmember Indians resident on the reservation differently from member residents undermines the tribal community. *See* Clinton, *Isolated in Their Own Country: A Defense of Federal Protection of Indian Autonomy and Self-Government,* 33 Stan.L.Rev. 979, 1015–16 (1981) (criticizing treating members and nonmembers differently with regard to state taxes because it fragments the tribal community).

The district court recognized that tribal court jurisdiction over nonmember Indians would strengthen tribal authority over the reservation. But it thought this consideration was outweighed by the injustice of

treating nonmember Indians differently from non-Indians. Neither nonmember Indians nor non-Indians may participate in tribal government. However, as explained above in the discussion of *Oliphant*, the Supreme Court did not exempt non-Indians from the criminal jurisdiction of tribal courts on the ground that they are excluded from tribal government. Had that been the case, non-Indians presumably would be exempt from the civil jurisdiction of tribal courts. That is not the case, however. *Iowa Mut. Ins. Co. v. LaPlante,* —— U.S. ——, 107 S.Ct. 971, 976, 94 L.Ed.2d 10 (1987); *Williams v. Lee,* 358 U.S. 217, 223, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

 We conclude that extending tribal court criminal jurisdiction to nonmember Indians who have significant contacts with a reservation does not amount to a racial classification. We further find that this policy is reasonably related to the legitimate goal of improving law enforcement on reservations. The district court's decision was in error.

## C. *A Jurisdictional Void*

Our conclusion is strengthened when we consider what would happen if we ruled that Duro is exempt from tribal court criminal jurisdiction. Duro argues that because neither he nor his supposed victim was a member of the Community, they must both be treated like non-Indians for the purpose of criminal jurisdiction. Thus only a state court could have jurisdiction over Duro.[5] *See* D. Getches, D. Rosenfelt & C. Wilkinson, *Cases and Materials on Federal Indi-*

an Law 388 (1979) (citing *United States v. McBratney,* 104 U.S. (14 Otto) 621, 26 L.Ed. 869 (1882)). The flaw in Duro's analysis is that state courts apparently do not exercise their criminal jurisdiction as Duro recommends. Notably, the record in this case shows no attempt to prosecute Duro in state court. At least one state court has held that it lacked jurisdiction over an Indian who allegedly committed a crime on a reservation, even though the Indian was not a member of the reservation tribe. *State v. Allan,* 100 Idaho 918, 921, 607 P.2d 426, 429 (1980). If no state court takes jurisdiction of Duro's case, there will be a jurisdiction void.

It is possible that state courts will henceforth extend their criminal jurisdiction to cases involving nonmember Indians such as Duro. But increasing state authority in Indian reservations has its own disadvantages. *See* Clinton, *State Power over Indian Reservations: A Critical Comment on Burger Court Doctrine,* 26 S.D.L.Rev. 434, 445–46 (1981) (criticizing the extension of state authority into Indian country as inconsistent with constitutional history and needlessly complex). We are fortunate to be able to avoid this dilemma.

We conclude that the tribal court had criminal jurisdiction over Duro. The district court erred in granting a writ of habeas corpus. Consequently it abused its discretion by issuing a writ of prohibition in aid thereof.

VACATED.

SNEED, Circuit Judge, dissenting:

I respectfully dissent. *Oliphant* should govern this case. Two commentators re-

---

5. Duro's reasoning precludes federal, as well as tribal, jurisdiction over his case. Federal courts have jurisdiction over Indian defendants accused of committing enumerated major crimes against non-Indians. 18 U.S.C. § 1153. It is not clear whether federal jurisdiction preempts tribal jurisdiction over these cases. *See United States v. John,* 437 U.S. 634, 651 n. 21, 98 S.Ct. 2541, 2550, n. 21, 57 L.Ed.2d 489 (1978). Lesser crimes committed by Indians against non-Indians, as well as all crimes committed by non-Indians against Indians, are punishable under 18 U.S.C. § 1152. That section extends federal enclave law to Indian country, although not to offenses committed by an Indian against another Indian, nor to any Indian who has already

been punished under tribal law. Under the Assimilative Crimes Act, 18 U.S.C. § 13, federal enclave law incorporates local state law where federal law defines no equivalent offense. *Williams v. United States,* 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962 (1946). However, as explained in the text, the courts have created an exception from federal jurisdiction for crimes committed between non-Indians, and "it appears to be too well entrenched to be overruled." Clinton, *Criminal Jurisdiction over Indian Lands; A Journey Through a Jurisdictional Maze,* 18 Ariz.L.Rev. 503, 524–26 (1976). Therefore if courts treat Duro and his victim as non-Indians, there will be no federal criminal jurisdiction over his case.

cently have concluded that, for purposes of determining the criminal jurisdiction of tribal courts, *Oliphant* and the history of relevant treaties and statutes suggest that nonmember Indians and non-Indians be treated the same. Clinton, *Isolated in Their Own Country: A Defense of Federal Protection of Indian Autonomy and Self-Government,* 33 Stan.L.Rev. 979, 1022 n. 251 (1981); *see* Comment, *Jurisdiction over Nonmember Indians on Reservations,* 1980 Ariz.St.L.J. 727, 737–49. The Supreme Court made this conclusion explicit in *United States v. Wheeler,* 435 U.S. 313, 322, 324, 326–27, 328, 98 S.Ct. 1079, 1085, 1086, 1087–88, 1088, 55 L.Ed.2d 303 (1978), by its emphasis of tribal sovereignty as the source of the tribe's criminal jurisdiction over its *members.*

Independently of these authorities, the equal protection clause of the Indian Civil Rights Act requires affirmance of the district court. To embrace the differential treatment of non-Indians and nonmember Indians within the context of this case is to employ a classification based upon race. It is true that special treatment of Indians in many situations has not been treated as being based on race but rather on the unique sovereignty of Indian Tribes. *See United States v. Antelope,* 430 U.S. 641, 645–47, 97 S.Ct. 1395, 1398–99, 51 L.Ed.2d 701 (1977). That sovereignty provides no proper basis for depriving a nonmember Indian of an immunity from tribal jurisdiction enjoyed by a non-Indian. Neither does the fact that the determination of who is an Indian sometimes involves factors other than race.

Laws based on racial classifications are subject to strict scrutiny. Extending tribal court criminal jurisdiction to nonmember Indians might incrementally aid law enforcement on reservations. But then so might its extension to non-Indians. However, clearly these extensions are not necessary to achieve a compelling governmental interest. Therefore it fails the applicable equal protection test.

Different tribes do things differently. Indian law traditionally respects the tribes' individuality. *See* Clinton, *supra,* at 984–91. Limiting a tribal court's criminal jurisdiction to members of its own tribe is quite consistent with the self-determination of Indian tribes. To bar its extension to nonmember Indians does not significantly impair tribal self-determination.